UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

ROBERT PRICE,

          Plaintiff,

v.

CARSON CITY CORRECTIONAL
FACILITY et al.,

          Defendants.

_____/

Case No. 1:24-cv-164

Honorable Ray Kent

## **OPINION**

This is a civil rights action under 42 U.S.C. § 1983 brought by a person who, at the time of filing, was a state prisoner. Pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure, Plaintiff consented to proceed in all matters in this action under the jurisdiction of a United States Magistrate Judge. (ECF No. 4.)

This case is presently before the Court for preliminary review under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). The Court is required to conduct this initial review prior to the service of the complaint. *See In re Prison Litig. Reform Act*, 105 F.3d 1131, 1131, 1134 (6th Cir. 1997); *McGore v. Wrigglesworth*, 114 F.3d 601, 604–05 (6th Cir. 1997). Service of the complaint on the named defendants is of particular significance in defining a putative defendant's relationship to the proceedings.

"An individual or entity named as a defendant is not obliged to engage in litigation unless notified of the action, and brought under a court's authority, by formal process." *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 347 (1999). "Service of process, under

longstanding tradition in our system of justice, is fundamental to any procedural imposition on a named defendant." *Id.* at 350. "[O]ne becomes a party officially, and is required to take action in that capacity, only upon service of a summons or other authority-asserting measure stating the time within which the party served must appear and defend." *Id.* (citations omitted). That is, "[u]nless a named defendant agrees to waive service, the summons continues to function as the *sine qua non* directing an individual or entity to participate in a civil action or forgo procedural or substantive rights." *Id.* at 351. Therefore, the PLRA, by requiring courts to review and even resolve a plaintiff's claims before service, creates a circumstance where there may only be one party to the proceeding—the plaintiff—at the district court level and on appeal. *See, e.g.*, *Conway v. Fayette Cnty. Gov't*, 212 F. App'x 418 (6th Cir. 2007) ("Pursuant to 28 U.S.C. § 1915A, the district court screened the complaint and dismissed it without prejudice before service was made upon any of the defendants . . . [such that] . . . only [the plaintiff] [wa]s a party to this appeal.").

Here, Plaintiff has consented to a United States magistrate judge conducting all proceedings in this case under 28 U.S.C. § 636(c). That statute provides that "[u]pon the consent of the parties, a full-time United States magistrate judge . . . may conduct any or all proceedings . . . and order the entry of judgment in the case . . . ." 28 U.S.C. § 636(c). Because the named Defendants have not yet been served, the undersigned concludes that they are not presently parties whose consent is required to permit the undersigned to conduct a preliminary review under the PLRA, in the same way they are not parties who will be served with or given notice of this opinion. *See Neals v. Norwood*, 59 F.3d 530, 532 (5th Cir. 1995) ("The record does not contain a

consent from the defendants[; h]owever, because they had not been served, they were not parties to this action at the time the magistrate entered judgment.").[1]

Under the PLRA, the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief.[2] 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). Further, under Rule 21 of the Federal Rules of Civil Procedure, a court may at any time, with or without motion, add or drop a party for misjoinder or nonjoinder. Fed. R. Civ. P. 21. Applying this standard regarding joinder, the Court will drop Defendants Unknown Eeardsman, Unknown Blair, Unknown White, R. Loomis, J. Kissell, A. Hitchingham, Unknown Bigelow, Unknown Juarez, Unknown Wright, Randee Rewerts, Unknown Garcia, and Unknown Becher as misjoined. The Court will dismiss Plaintiff's claims against the misjoined Defendants without prejudice. With regard to the remaining Defendants—Carson City Correctional Facility (DRF), Unknown Nesbitt, J. Burns, D. Dine, and Unknown King—the Court will dismiss the complaint for failure to state a claim.

---

[1] *But see Coleman v. Lab. & Indus. Rev. Comm'n of Wis.*, 860 F.3d 461, 471 (7th Cir. 2017) (concluding that, when determining which parties are required to consent to proceed before a United States magistrate judge under 28 U.S.C. § 636(c), "context matters" and the context the United States Supreme Court considered in *Murphy Bros.* was nothing like the context of a screening dismissal pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c)); *Williams v. King*, 875 F.3d 500, 503–04 (9th Cir. 2017) (relying on Black's Law Dictionary for the definition of "parties" and not addressing *Murphy Bros.*); *Burton v. Schamp*, 25 F.4th 198, 207 n.26 (3d Cir. 2022) (premising its discussion of "the term 'parties' solely in relation to its meaning in Section 636(c)(1), and . . . not tak[ing] an opinion on the meaning of 'parties' in other contexts").

[2] The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992).

<u>Discussion</u>

I.    ***In Forma Pauperis* Status**

Plaintiff was discharged from the custody of the Michigan Department of Corrections (MDOC) on June 8, 2024. In *McGore v. Wrigglesworth*, 114 F.3d 601 (6th Cir. 1997), the Sixth Circuit Court of Appeals considered how release from prison might impact a prisoner's obligation to pay the filing fee under the PLRA. The Sixth Circuit held that "[a]fter release, the obligation to pay the remainder of the fees is to be determined solely on the question of whether the released individual qualifies for pauper status." *McGore*, 114 F.3d at 613. Accordingly, the Court directed Plaintiff to file a new application to proceed *in forma pauperis*. (Order, ECF No. 7.) Plaintiff has responded by filing a new application to proceed *in forma pauperis*. (ECF No. 8.) Based on Plaintiff's new application, the Court concludes that Plaintiff is unable to pay the filing fees. Accordingly, the Court will grant Plaintiff leave to proceed *in forma pauperis*.

II.    **Factual Allegations**

When Plaintiff filed his complaint, he was incarcerated with the MDOC at DRF in Carson City, Montcalm County, Michigan. The events about which he complains occurred at that facility.[3] Plaintiff sues the following DRF personnel: Warden Randee Rewerts; Assistant Deputy Warden Unknown Garcia; Grievance Coordinator Unknown Becher; Prison Counselors Unknown Eeardsman and Unknown Nesbitt; Residential Unit Manager Unknown Blair; Classification Director J. Burns; Mailroom Supervisor and Business Office Supervisor D. Dine; Accounting Tech Unknown King; Law Library Manager R. Loomis; Library Techs J. Kissell and A. Hitchingham;

---

[3] Plaintiff also alleges facts regarding his incarceration at the St. Louis Correctional Facility (SLF) in St. Louis, Gratiot County, Michigan. (Compl., ECF No. 1, PageID.3–6, ¶¶ 1–8.) But the allegations against the present defendants all relate to Plaintiff's time at DRF.

Sergeant Unknown Bigelow; and Corrections Officers Unknown White, Unknown Juarez, and Unknown Wright.

### A.    Indigent Status

Plaintiff arrived at DRF on July 7, 2023. (Compl., ECF No. 1, PageID.6, ¶ 9.) Upon his arrival, he discovered he was missing hygiene items and batteries, and his shampoo had been poured all over his legal property. (*Id.*, PageID.7.)[4] Because he was left without hygiene items, Plaintiff approached Defendant Nesbitt on July 8, 2023, explaining that Plaintiff needed to apply for indigent status for the next month. (*Id.*) Nesbitt agreed and told Plaintiff he took care of it. (*Id.*)

Plaintiff attaches to his complaint an excerpt from the MDOC Policy Directive regarding indigent prisoners. MDOC Policy Directive 04.02.120, Indigent Prisoners (effective Aug. 24, 2020); (ECF No. 1-1, PageID.56).[5] The policy directive states:

### B.    A prisoner is eligible for indigent status if they meet all of the following criteria:

---

[4] Plaintiff attributes the loss of his hygiene items and the damage to his legal property to personnel at SLF, not the Defendants named in this action. (Grievance, ECF No. 1-1, PageID.36.)

[5] The Court may consider documents that are attached to a pro se complaint when considering whether the complaint states a claim upon which relief should be granted. *See, e.g., Powell v. Messary*, 11 F. App'x 389, 390 (6th Cir. 2001) (affirming the Eastern District of Michigan District Court's consideration of the attachments to the plaintiff's complaint to determine that the plaintiff had received medical treatment and, therefore, failed to state a claim under the Eighth Amendment); *Hardy v. Sizer*, No. 16-1979, 2018 WL 3244002 (6th Cir. May 23, 2018) (affirming this Court's consideration of the plaintiff's complaint allegations and the documents attached to the complaint to support the determination that the plaintiff failed to state a claim); *Hogan v. Lucas*, No. 20- 4260, 2022 WL 2118213, at *3 n.2 (6th Cir. May 20, 2022) (stating that "[b]ecause the documents attached to Hogan's complaint are referenced in the complaint and 'central to the claims contained therein,' they were properly considered at the § 1915(e)(2) screening stage" (citations omitted)). The Court will generally accept as true the statements that Plaintiff makes in the documents he has attached to the complaint. The Court will generally not accept as true statements made by others in the documents Plaintiff attaches to the complaint except to the extent that Plaintiff relies on the truth of those statements in his complaint. "When a document attached to the complaint contradicts the allegations, the document trumps the allegations . . . [if the] document . . . 'utterly discredit[s]' the allegations." *In re Flint Water Cases*, 960 F.3d 303, 329 (6th Cir. 2020).

1.      The prisoner's available account balance (on the first day of the calendar month preceding application) plus gross receipts (total receipts received in the calendar month preceding application) did not equal or exceeded $11.00 except as follows:

    a.      If funds are received that are designated for release planning or for medical or educational expenses, those funds shall not be used in the calculation.

    b.      If there is a hold placed on funds that are subject to a hearing (e.g., Health Care co-pay, restitution, error correct), those funds would not be included in the prisoner's beginning available account balance.

    c.      If the prisoner is subject to IRS federal tax withholding, then receipts shall be determined before the tax has been withheld.

2.      The prisoner has no known cashable savings bonds.

C.      A prisoner eligible for indigent status must apply to the Warden or designee to request placement on the indigent list. The prisoner shall be placed on the indigent list if they meet the eligibility criteria set forth in Paragraph B. The prisoner shall remain on the list for a one-month period, at which time the prisoner must reapply if they want to be considered for placement on the indigent list for another one-month period. For example, if the prisoner is placed on the list on the 10th of the month, they remain on the list only until the 9th of the following month unless the prisoner has reapplied and has been approved for placement on the list for another one-month period. A prisoner shall be considered indigent only while on the indigent list.

(ECF No. 1-1, PageID.56.) Plaintiff also attaches an excerpt from the Indigent Prisoners Operating Procedure regarding Indigent Prisoners from the Chippewa Correctional Facility. (ECF No. 1-1, PageID.60.) That operating procedure, however, does not by its terms apply to DRF. (*Id*.) Plaintiff additionally attaches a Step I grievance response and a series of memoranda from Defendant Burns which set out some of the "rules" of the DRF Indigent Prisoner program. (ECF No. 1-1, PageID.39, 48, 50, 52, 54.) And Plaintiff attaches documents relating to his trust account showing balances for the relevant period, at least through November 14, 2023. (ECF No. 1-1, PageID.57–58, 62–64.)

6

By August, Plaintiff discovered that Defendant Nesbitt was being transferred and that he had never signed Plaintiff up for indigency. (Compl., ECF No. 1, PageID.7.) Thus, Plaintiff was not deemed indigent for the month of August. He reports he went without hygiene items.

During August, Plaintiff applied for indigency for the month of September. (*Id.*, PageID.17, ¶ 31.) His request was denied because funds coming into his account disqualified him. (*Id.*; *see also* MDOC Memoranda to Plaintiff, ECF No. 1-1, PageID.48–49, 57.) Plaintiff applied for indigency for the month of October. His request was denied because funds coming into his account disqualified him. (Compl., ECF No 1, PageID.18–19; *see also* MDOC Memoranda to Plaintiff, ECF No. 1-1, PageID.50–51.) In the middle of October, Plaintiff removed himself from his work detail, apparently because he believed the benefits of indigency outweighed the benefit of earning money from the work detail. (Compl., ECF No. 1, PageID.19–20; MDOC Assignment Waiver Form, ECF No. 1-1, PageID.61.) Plaintiff applied for indigency for the month of November. His request was denied because funds coming into his account disqualified him. (Compl., ECF No. 1, PageID.20–21; *see also* MDOC Memorandum to Plaintiff, ECF No. 1-1, PageID.53.) Plaintiff applied for indigency for the month of December. His request was denied because his November beginning account balance disqualified him. (*Id.*; *see also* Compl., ECF No. 1, PageID.26, ¶ 44; MDOC Memoranda, ECF No. 1-1, PageID.54–55.)

Plaintiff lists Defendants King, Burns, and Dine in the case caption, but he makes almost no allegations against them. Plaintiff mentions Defendant King in one paragraph in his complaint. On October 2, 2023, Defendant King provided an account statement to Plaintiff that covered the period from August 1 to September 29, 2023, that showed an $11.00 account balance, (Compl., ECF No. 1, PageID.18, ¶ 34; Account Statement, ECF No. 1-1, PageID.57–59.) Plaintiff does not really mention Defendants Burns or Dine in his complaint allegations; but Burns authored the

attached memoranda advising Plaintiff about his indigent status and Dine signed an account statement that showed Plaintiff had an $11.00 balance on November 14, 2023, (ECF No. 1-1, PageID.62–63).

### B.    Aromatic Cellmate

Plaintiff notes that he was housed with another inmate who did not shower. (Compl., ECF No. 1, PageID.8.) Plaintiff reports that the smell was repulsive. He asked Defendant Nesbitt and his replacement, Defendant Eeardsman, for a new housing placement. Plaintiff does not indicate how Defendant Nesbitt responded; but Plaintiff reports that Nesbitt's successor, Eeardsman, responded: "The only place you[ are] going to go is the []hole[;] you don't have a choice[;] lock up or fuck off." (*Id*.) Plaintiff wrote a grievance against Eeardsman about the matter, to no avail.

### C.    Law Library and Legal Mail Call Outs

Plaintiff alleges that when he arrived at DRF, he submitted a request to be placed on the law library call-out. (*Id*., PageID.9.) Plaintiff did not get a call-out for weeks. He confronted Defendants Kissell and Hitchingham, who advised Plaintiff to submit a kite. (*Id*.)

On July 19, 2023, Plaintiff received a call out to get his legal mail. The document Plaintiff received was a July 5, 2023, order from the Michigan Court of Appeals denying his application for leave to appeal the trial court's denial of his motion for relief from judgment.[6] By the time

---

[6] The docket for Plaintiff's appeal reveals why it took so long for Plaintiff to receive the order. The order was mailed out while Plaintiff still resided at SLF, and, thus, it appears to have been mailed to that facility. Plaintiff did not notify the Michigan Court of Appeals of his new address until July 14, 2023. Case Information, *People v. Price*, No. 365049 (Mich. Ct. App.) https://www.courts.michigan.gov/c/courts/coa/case/365049 (last visited Dec. 16, 2024). Plaintiff attaches the envelope that contained the order to his complaint. (ECF No. 1-2, PageID.66.) The envelope is postmarked July 5, 2023. (*Id*.) It is apparent that the envelope was first sent to another address and then a new address label was attached with Plaintiff's then current address at DRF. There are no other postage markings on the envelope; thus, it appears the order was sent from SLF to DRF by internal MDOC delivery.

plaintiff received the order, only a few days remained for Plaintiff to file a motion for reconsideration.[7] (*See id.*) Plaintiff attempted to file a motion to extend the time to file the motion for reconsideration. (*See id.*) The court of appeals returned that motion because there was no provision for filing such a motion. (*See id.*); *see also* Case Information, *People v. Price*, No. 365049 (Mich. Ct. App.) https://www.courts.michigan.gov/c/courts/coa/case/365049 (last visited Dec. 16, 2024). Plaintiff attempted to file his late motion for reconsideration a few days later, but it was rejected. *See* Case Information, *People v. Price*, No. 365049 (Mich. Ct. App.) https://www.courts.michigan.gov/c/courts/coa/case/365049 (last visited Dec. 16, 2024).[8]

Plaintiff holds Defendant Dine responsible for the alleged two-week delay in receiving the Michigan Court of Appeals order. He blames Dine because Dine is the supervisor for the mail room. (Compl., ECF No. 1, PageID.16, ¶ 32.) Plaintiff suggests that his appeal was "dismissed" because he missed the deadline. The documents attached to Plaintiff's complaint and the publicly-available docket from his appeal flatly contradict Plaintiff's assertions. Plaintiff's application for leave to appeal in the court of appeals was denied on July 5. Indeed, the denial was the document that Plaintiff claims was delivered late. Thus, Plaintiff's appeal was "dismissed" before the document was mailed.

---

[7] Plaintiff does not detail the argument he intended to present in his motion for reconsideration. The appellate court's order denied Plaintiff's application for leave to appeal in one sentence: "The delayed application for leave to appeal is DENIED because defendant has failed to establish that the trial court erred in denying the motion for relief from judgment." *See* Order, *People v. Price*, No. 365049 (Mich. Ct. App. July 5, 2023), https://www.courts.michigan.gov/c/courts/coa/case/365049 (last visited Dec. 16, 2024).

[8] On August 16, 2023, Plaintiff timely filed his application for leave to appeal to the Michigan Supreme Court. That court denied leave by order entered January 30, 2024. *See* Case Information, *People v. Price*, No. 365049 (Mich. Ct. App.) https://www.courts.michigan.gov/c/courts/coa/case/365049 (last visited Dec. 16, 2024).

Moreover, Plaintiff's claim that the document was delivered to him two weeks late is belied by the envelope he attaches to his complaint. Plaintiff highlights the postmark on the envelope as proof that the document was received at DRF on July 5. As set forth in note 6, *supra*, the court of appeals mailed the document on July 5. The highlighted date is the date the document was sent, not the day it was received. Moreover, based on the Michigan Court of Appeals docket, at the time the document was mailed, the address the court had for Plaintiff was at SLF. Plaintiff was not transferred until July 7, 2023, so the document was not likely received before that date. Even if it had been received before Plaintiff was transferred, it was not delivered to him at SLF. At some point, a new address label was added to the envelope and the document eventually made it to DRF where it was delivered to Plaintiff on July 19. The documents that Plaintiff attaches to his complaint clearly contradict his factual allegations, but they do not establish when DRF received the document.

In addition to the delay in receiving the document, Plaintiff also contends that Nesbitt failed to promptly call Plaintiff out for legal mail. In Plaintiff's initial grievance regarding the matter, after explaining that he only had four days to file his motion for reconsideration, Plaintiff states: "and that's if PC. Nesbit[t] calls me out because I've requested legal mail for one week and haven't been called out yet." (Grievance, ECF No. 1-2, PageID.68.) It is not clear what Plaintiff intended to mail when he asked Defendant to call him out during the week preceding Plaintiff's receipt of the Michigan Court of Appeals order. The Michigan Court of Appeals docket indicates that Plaintiff sent a mailing to the court on July 14, 2023, informing the court of Plaintiff's new address. *See* Case Information, *People v. Price*, No. 365049 (Mich. Ct. App.) https://www.courts.michigan. gov/c/courts/coa/case/365049 (last visited Dec. 16, 2024). Because that mailing was sent the day after Plaintiff's arrival, it could not be the mailing that Nesbitt delayed for one week. Indeed, at

the time Plaintiff complained about Nesbitt's one week delay, he had only been at DRF for 13 days.

It does not appear that Plaintiff suffered any delay in mailing out his request for an extension of the reconsideration deadline. He submits with his complaint the disbursement authorization for the mailing of that request. (ECF No. 1-2, PageID.71.) Defendant Nesbitt received the legal mail on July 21, 2023, and it was mailed out the next business day. Moreover, the request was denied because there was no provision for such a motion—not because it was late. (July 28, 2023, Mich. Ct. App. Correspondence, ECF No. 1-2, PageID.73.)

Finally, as part of Plaintiff's submission to Michigan Supreme Court, Plaintiff attempted to attach the call-out pass he received to pick up his legal mail on July 19, 2023. (Compl., ECF No. 1, PageID.10, ¶ 18.) Defendant Hitchingham informed Plaintiff that she had removed that pass and disposed of it. Such a pass, once it had expired, was considered contraband.[9] Plaintiff notes that he still had a copy of the pass, and he attached a copy to his complaint. (ECF No. 1-2, PageID.67.)

### D.    Out of Cell While on Loss of Privileges

On August 3, 2023, Plaintiff dropped a couple of kites in the mailbox. (Compl., ECF No. 1, PageID.12, ¶ 23.) As he did so, he saw Defendant Nesbitt say something to Defendant White. (*Id*.) Two hours later, Plaintiff was called out by Defendant White. (*Id*.) White asked Plaintiff to sign off on a misconduct ticket for being outside of his cell when Plaintiff was on "loss of privileges."[10]

---

[9] Although Plaintiff contends that he should be permitted to possess an expired pass if it is a legal document relevant to his case, he does not dispute that it would otherwise be contraband. (Compl., ECF No. 1, PageID.11, ¶ 20 (stating that "normally the kite or pass would be considered contraband").)

[10] "[A]ll of the following privileges will be lost by a prisoner as a result of a 'loss of privileges' sanction: A. Day room, activity room, TV room, study room, or other designated area where similar activities occur[;] B. Exercise facilities, such as yard, gym, and weight room/pit[;] C. Group

(*Id*., PageID.13.) A day or two later, Defendant Bigelow asked Plaintiff if he would sign a Class II ticket for putting mail in the mailbox while Plaintiff was on "loss of privileges." (*Id*.) Plaintiff refused to sign. (*Id*.)

On August 9, 2023, Plaintiff was called out by Defendant Blair. (*Id*.) Plaintiff told Blair that Plaintiff was only putting mail in the mailbox. (*Id*.) According to Plaintiff, Blair told Plaintiff that if he was only putting mail in the mailbox, it would not be misconduct. Blair indicated he would check the cameras and if Plaintiff had only put mail in the mailbox, Blair would toss the misconduct. Plaintiff received Blair's decision a couple of weeks later. Blair found Plaintiff guilty of being out of his cell while Plaintiff was on the "loss of privileges" sanction.

Plaintiff focuses on the fact that he was mailing kites.[11] It does not appear that mailing kites was the focus of the misconduct. The misconduct was based on Plaintiff being out of his cell. (Misconduct Rep., ECF No. 1-4, PageID.89; Misconduct Hr'g Rep., ECF No. 1-4, PageID.90.)

---

meetings, such as Bible class and Jaycees, but not including primary religious worship service; this does not apply to group therapy[;] D. Out of cell hobbycraft activities[;] E. Kitchen area, including microwave, ice machine, and hot water dispenser[;] F. Direct access to general library (not law library; prisoners in segregation shall continue to have books delivered to them consistent with PD 04.05.120 "Segregation Standards")[;] G. Movies[;] H. Music practice; musical instruments[;] I. Leisure time activities offered pursuant to PD 05.03.104 "Leisure Time Activities," except as approved by Warden or designee[;] J. Telephone, except calls to the Office of Legislative Corrections Ombudsman and to return calls from an attorney upon request of the attorney[;] K. Visiting[, t]his applies only if hearing officer identified in the hearing report that the misconduct occurred in connection with a visit, and only with the visitor named in the hearing report[; and] L. Use of kiosk (e.g., to send/receive electronic messages or retrieve account information). MDOC Policy Directive 03.03.105, Att. E (eff. Apr. 18, 2022). Plaintiff was on seven months of "loss of privileges" because of events that occurred at SLF. *See supra* note 3. One significant effect of the sanction is to "curb[] [the prisoner's] out-of-cell time." *Finley v. Huss*, 102 F.4th 789, 823 n. 17(6th Cir. 2024).

[11] Plaintiff contends that because the ability to send and receive mail is a First Amendment right he could leave his cell to place items in the mailbox. In another grievance, on August 2, 2023, he acknowledged that he was "on L.O.P. just transferred here and can't get out of [his] cell at all . . . ." (Grievance, ECF No. 1-2, PageID.70.)

After the misconduct determination, Defendant Blair started making routine passages through Plaintiff's unit. (Compl., ECF No. 1, PageID.15.) When Blair saw Plaintiff, Blair would laugh and make remarks to other inmates and staff. (*Id.*) Plaintiff could only infer that Blair thought it was very humorous that he made Plaintiff believe he would beat the ticket. (*Id.*)

Plaintiff attempted to appeal the misconduct determination, but the grievance coordinator told Plaintiff to get the papers from the prison counselor, and the prison counselor was never in his office. (*Id.*, PageID.14.) Plaintiff wrote to Defendants Rewerts and Garcia about it, but Plaintiff never received a response.

### E.    Failure to Treat Serious Medical Needs

Plaintiff reports that he was receiving medical treatment offsite during the time he was housed at DRF. (*Id.*, PageID.21–22.) Plaintiff states he was having issues with getting proper meds or getting "medical" to respond to his kites within the proper time as set forth in MDOC policy directives. (*Id.*, PageID.21, ¶ 39.) Plaintiff indicates that he attended an offsite physical therapy appointment on November 2, 2023. (*Id.*, PageID.22, ¶ 40.) During that appointment, Plaintiff was treated with a TENS unit.[12] Although Plaintiff did not realize it at the time, the TENS unit had burnt his back. (*Id.*) Plaintiff was treated with ibuprofen and triple antibiotic cream. (*Id.*)

---

[12] "Transcutaneous electrical nerve stimulation, or TENS, is a therapeutic approach employing electric current to activate peripheral nerves for pain relief. . . . Electrodes are applied to the skin . . . and connected to the TENS unit via wires. Users can then adjust the pulse amplitude, frequency, duration, and pattern of the currents." Dac Teoli, Anterpreet Dua, & Jason An, *Transcutaneous Electrical Nerve Stimulation*, StatPearls Publishing (2024), https://www.ncbi.nlm.nih.gov/books/NBK537188/ (last visited Dec. 16, 2024).

### F.    Denial of a Meal on November 13, 2023

Plaintiff reports that every inmate on the unit received the evening meal—chicken on the bone—except him. (*Id.*, PageID.24–26.) Plaintiff complained. He was offered a snack bag, but Plaintiff declined. (*Id.*, PageID.25, ¶ 42.)

Plaintiff grieved the matter. (*Id.*, PageID.26, ¶ 43.) It was investigated by Defendant Bigelow. (*Id.*) Plaintiff recounts his discussion with Defendant Bigelow. (*Id.*, PageID.26–29.) The end result was that Plaintiff was dissatisfied with the Step I response.

By the time Plaintiff received the Step I response, however, he had been transferred to the Chippewa Correctional Facility (URF) in in Kincheloe, Chippewa County, Michigan. (*Id.*, PageID.27–28.) Before being transferred out, however, he was again denied an evening meal tray. (*Id.*, PageID.29.) He ultimately received the tray, but it was four hours later than it should have been. (*Id.*)

### G.    Relief Sought

Plaintiff contends that Defendants violated many of his constitutional rights, but mainly Plaintiff's First Amendment rights—they conspired with each other to retaliate against Plaintiff to make him suffer a great deal. (Compl., ECF No. 1, PageID.30.) Plaintiff seeks an injunction to "correct the system" and monetary relief "above [$]20,000" and an order placing "sanctions and punishment" on the Defendants. (*Id.*)

## III.   Misjoinder

### A.    Joinder

Federal Rule of Civil Procedure 20(a) limits the joinder of parties in a single lawsuit, whereas Federal Rule of Civil Procedure 18(a) limits the joinder of claims. Rule 20(a)(2) governs when multiple defendants may be joined in one action:

> [p]ersons . . . may be joined in one action as defendants if: (A) any right to relief is
> asserted against them jointly, severally, or in the alternative with respect to or
> arising out of the same transaction, occurrence, or series of transactions or
> occurrences; and (B) any question of law or fact common to all defendants will
> arise in the action."

Fed. R. Civ. P. 20(a)(2). Rule 18(a) states: "A party asserting a claim . . . may join, as independent

or alternative claims, as many claims as it has against an opposing party." Fed. R. Civ. P. 18(a).

Courts have recognized that, where multiple parties are named, as in this case, the analysis

under Rule 20 precedes that under Rule 18:

> Rule 20 deals solely with joinder of parties and becomes relevant only when there
> is more than one party on one or both sides of the action. It is not concerned with
> joinder of claims, which is governed by Rule 18. Therefore, in actions involving
> multiple defendants Rule 20 operates independently of Rule 18. . . .
>
> Despite the broad language of Rule 18(a), plaintiff may join multiple defendants in
> a single action only if plaintiff asserts at least one claim to relief against each of
> them that arises out of the same transaction or occurrence and presents questions of
> law or fact common to all.

7 Charles Allen Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1655 (3d ed. 2001),

*quoted in Proctor v. Applegate*, 661 F. Supp. 2d 743, 778 (E.D. Mich. 2009), *and Garcia v. Munoz*,

No. 08-1648, 2008 WL 2064476, at *3 (D.N.J. May 14, 2008); *see also United States v.

Mississippi*, 380 U.S. 128, 142–43 (1965) (discussing that joinder of defendants is permitted by

Rule 20 if both commonality and same transaction requirements are satisfied); *UWM Student Ass'n

v. Lovell*, 888 F.3d 854, 863 (7th Cir. 2018) ("Unrelated claims against different defendants belong

in different suits." *George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007). A district judge necessarily

has considerable discretion in applying Rules 18 and 20. The rules 'operate[ ] independently'

because Rule 20 contains limitations that Rule 18 does not, and the Rule 20 inquiry comes first.").

Therefore, "a civil plaintiff may not name more than one defendant in his original or

amended complaint unless one claim against each additional defendant is transactionally related

to the claim against the first defendant and involves a common question of law or fact." *Proctor*,

661 F. Supp. 2d at 778 (internal quotation marks omitted). When determining if civil rights claims arise from the same transaction or occurrence, a court may consider a variety of factors, including, "the time period during which the alleged acts occurred; whether the acts . . . are related; whether more than one act . . . is alleged; whether the same supervisors were involved, and whether the defendants were at different geographical locations." *Id.* (citation omitted).

Permitting improper joinder in a prisoner civil rights action undermines the purpose of the PLRA, which was to reduce the large number of frivolous prisoner lawsuits that were being filed in the federal courts. *See Riley v. Kurtz*, 361 F.3d 906, 917 (6th Cir. 2004). The Seventh Circuit has explained that a prisoner like plaintiff may not join in one complaint all of the defendants against whom he may have a claim, unless the prisoner satisfies the dual requirements of Rule 20(a)(2):

> Thus multiple claims against a single party are fine, but Claim A against Defendant 1 should not be joined with unrelated Claim B against Defendant 2. Unrelated claims against different defendants belong in different suits, not only to prevent the sort of morass that [a multi]-claim, [multi]-defendant suit produce[s] but also to ensure that prisoners pay the required filing fees—for the Prison Litigation Reform Act limits to 3 the number of frivolous suits or appeals that any prisoner may file without prepayment of the required fees. 28 U.S.C. § 1915(g) . . . .
>
> A buckshot complaint that would be rejected if filed by a free person—say, a suit complaining that A defrauded the plaintiff, B defamed him, C punched him, D failed to pay a debt, and E infringed his copyright, all in different transactions—should be rejected if filed by a prisoner.

*George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007); *see also Brown v. Blaine*, 185 F. App'x 166, 168–69 (3d Cir. 2006) (allowing an inmate to assert unrelated claims against new defendants based on actions taken after the filing of his original complaint would have defeated the purpose of the three strikes provision of PLRA).

Under these circumstances, to allow Plaintiff to proceed with improperly joined claims and Defendants in a single action would permit him to circumvent the PLRA's filing fee provisions

and allow him to avoid having to incur a "strike" for purposes of § 1915(g), should any of his claims be dismissed as frivolous or for failure to state a claim. Courts are therefore obligated to reject misjoined claims like Plaintiff's. *See Owens v. Hinsley*, 635 F.3d 950, 952 (7th Cir. 2011).

Here, Defendant Nesbitt is the first DRF Defendant mentioned in Plaintiff's factual allegations. (*See* Compl., ECF No. 1, PageID.7.)[13] Plaintiff alleges that he told Defendant Nesbitt about the destruction of Plaintiff hygiene supplies and that Plaintiff would like to sign up for indigent status for August. (*Id*.) When August arrived, Plaintiff found out that Defendant Nesbitt never signed Plaintiff up for indigent status and that Nesbitt was getting transferred to another facility. (*Id*.)

Considering first whether other Defendants are properly joined under Rule 20, the Court must determine whether one claim against each additional defendant is transactionally related to the claim against Defendant Nesbitt and involves a common question of law or fact. The Court concludes that Plaintiff's claims relating to the denial of indigent status generally involve a common question of law or fact. Reading Plaintiff's allegations indulgently, the Court concludes that Plaintiff intended to raise claims transactionally relating to the denial of indigent status against the following Defendants: DRF, Classification Director J. Burns, Business Office Director D. Dine, and Accounting Tech Unknown King.

Turning to Rule 18, Plaintiff could join to his "indigency" claims against Defendant Nesbitt, DRF, Burns, Dine, and King any other claims against those Defendants. Fed. R. Civ. P. 18(a) ("A party asserting a claim . . . may join, as independent or alternative claims, as many claims as it has against an opposing party."). Plaintiff mentions Defendant Nesbitt in only two other

---

[13] The analysis of joinder must start somewhere. By accepting the first-named Defendant and the factual allegations against the first-named Defendant as the foundation for the joinder analysis, the Court is considering the issue of joinder of parties as Plaintiff has presented it in his complaint.

sections of his complaint. First, in a grievance relating to the delay that Plaintiff experienced before receiving the Michigan Court of Appeals order—a grievance against the DRF mailroom, apparently—Plaintiff notes that his time to send out a motion for reconsideration is limited and that it depends on Defendant Nesbitt calling him out and, despite earlier requests, Nesbitt had not yet called Plaintiff out.

> The only other allegations relating to Defendant Nesbitt read as follows:
>
> On 8/3/2023 I went to the mail box to drop a couple of kites in the box. I [saw] PC. Nesbitt nod and say something to CO. White and I went back to my cell. PC. Nesbitt was upset with me for fil[]ing a grievance on him for [lying] about putting me on the indigent list when he never did. Two hours later I got a call out by CO. White asking me if I'm going to sign the misconduct ticket.

(*Id.*, PageID.12–13, ¶ 23.) The Court will address those properly joined claims against Defendant Nesbitt.

Plaintiff makes one other claim against Defendant Dine. He blames Dine for the delay in receiving the court of appeals order denying the application for leave to appeal. Plaintiff makes no other claims against Defendants Burns or King.

Plaintiff's allegations against Defendants DRF, Nesbitt, Classification Director J. Burns, Business Office Director D. Dine, and Accounting Tech Unknown King regarding Plaintiff's indigence are transactionally *unrelated* to Plaintiff's allegations against Defendants Unknown Eeardsman, Unknown Blair, Unknown White, R. Loomis, J. Kissell, A. Hitchingham, Unknown Bigelow, Unknown Juarez, Unknown Wright, Randee Rewerts, Unknown Garcia, and Unknown Becher. Moreover, there are no questions of law and fact that are common between Plaintiff's claims against DRF, Nesbitt, Burns, Dine, and King, on the one hand, and Plaintiff's claims against Defendants Unknown Eeardsman, Unknown Blair, Unknown White, R. Loomis, J. Kissell, A. Hitchingham, Unknown Bigelow, Unknown Juarez, Unknown Wright, Randee Rewerts, Unknown Garcia, and Unknown Becher, on the other hand. For any of those additional defendants to be

18

joined, Plaintiff's claims against that defendant must have a question of law or fact in common with the questions of law or fact that are at issue in Plaintiff's claims relating to his indigency status as raised against Defendants DRF, Nesbitt, Burns, Dine, and King. There is no such commonality apparent in Plaintiff's complaint.

Plaintiff offers conclusory allegations that the harms that befell him at SLF, DRF, and URF are all part of some grand, overarching conspiracy. For example, he states

> Many [have] colluded to pursue deprivations of many constitutional rights of mine. I seek a jury trial to sue in the personal and official capacity for many officials of the department of corrections, on grounds of many statutes connected to the [F]irst [A]mendment known as the right to grievance, the right to mail, the [right to] access [the] court and tort by retaliation that's followed from prison to prison as word has spread through bondage of co-workers to continue harassment against a single individual by a series of events creating evidence by a pattern of numerous acts with a short time span[] amongst each individual official in every department and allowed in acquiescence by the officials placed in charge of these departments that [were] well aware of the activities tak[ing] place as many grievances were filed and many kites were written through several months as I was subjected to the situations breaching my safety from one prison as many officials intentionally caused personal attacks from St. Louis Level IV and as I was transferred to Carson City Level IV the harassment has continued with every deprivation and act directed personally at me and no body else with no cause or purpose other than sadistic humiliation for their personal humor and malicious intent to deprive and hinder my rights and they took place as follows . . . .

> * * *

> [B]y a pattern of events enacted you can see that the staff continued to subject me to many deprivations and put me in many situations to intentionally cause suffering, pain and misery.

> * * *

> It's apparent that hav[]ing the issues and the acts I was subjected to in St. Louis Level IV to then being transferred to Cars[o]n City on July 7th, 2023 and hav[]ing had problems with many staff in about 4 different departments immediately within one month of resid[]ing without me provid[]ing such reason to embrace such action to deserve what I faced from the what the official put me through and not doing anything to them to cause them to want to only shows that th[ere] was another motive that embraced the interest to direct such actions at me which shows a casual [sic] connection[].

* * *

> I have been violated of many constitutional rights but they acted mainly ag[ai]nst my [F]irst [A]mendment [rights] and conspired with others in retaliation to make me suffer a great deal and as much as they could.

(Compl., ECF No. 1, PageID.2–3, 7, 12, 30.)

A civil conspiracy under § 1983 is "an agreement between two or more persons to injure another by unlawful action." *See Hensley v. Gassman*, 693 F.3d 681, 695 (6th Cir. 2012) (quoting *Hooks v. Hooks*, 771 F.2d 935, 943–44 (6th Cir. 1985)). The plaintiff must show the existence of a single plan, that the alleged coconspirator shared in the general conspiratorial objective to deprive the plaintiff of a federal right, and that an overt action committed in furtherance of the conspiracy caused an injury to the plaintiff. *Hensley*, 693 F.3d at 695; *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011).

Moreover, a plaintiff must plead a conspiracy with particularity, as vague and conclusory allegations unsupported by material facts are insufficient. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 565 (2007) (recognizing that allegations of conspiracy must be supported by allegations of fact that support a "plausible suggestion of conspiracy," not merely a "possible" one); *Fieger v. Cox*, 524 F.3d 770, 776 (6th Cir. 2008); *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003); *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987). A conspiracy claim fails when a plaintiff alleges facts showing that the defendants acted together but does not allege facts showing that the parties agreed to an objective to deprive the plaintiff of his civil rights. *See Siefert v. Hamilton Cnty. Bd. of Comm'rs*, 951 F.3d 753, 768 (6th Cir. 2020).

When conducting this initial review, the Court must "accept all well-pleaded allegations in plaintiff's complaint as true and view facts in the light most favorable to plaintiff, [but the Court] 'need not accept as true legal conclusions or unwarranted factual inferences.'" *Nugent v. Spectrum Juvenile Justice Servs.*, 72 F.4th 135, 138 (6th Cir. 2023) (quoting *Bouye v. Bruce*, 61 F.4th 485,

489 (6th Cir. 2023); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."); *Papasan v. Allain*, 478 U.S. 265, 286 (1986) (noting that in reviewing a motion to dismiss, the district court "must take all the factual allegations in the complaint as true," but that the court is "not bound to accept as true a legal conclusion couched as a factual allegation").

Plaintiff's allegations, even construed indulgently, describe discrete occurrences involving Defendants. Plaintiff appears to rely entirely on a highly attenuated and unwarranted inference of a conspiracy from the mere fact that Defendants took allegedly adverse actions against him over a months-long period of time. As the United States Supreme Court has held, such allegations, while hinting at a sheer "possibility" of conspiracy, do not contain "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556–57. Instead, the Supreme Court has recognized that, although parallel conduct may be consistent with an unlawful agreement, it is insufficient to state a claim where that conduct "was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed . . . behavior." *Iqbal*, 556 U.S. at 680 (citing *Twombly*, 550 U.S. at 567).

Therefore, the Court will not accept as true Plaintiff's allegations of a broad conspiracy because they are no more than legal conclusions and unwarranted inferences. The "conspiracy" does not suffice to create a transactional relationship between the diverse and disparate events he describes in the complaint nor does it serve as the common issue of law or fact that might support joinder of all of Plaintiff's claims. *See, e.g., UWM Student Ass'n*, 888 F.3d at 863–64.

Accordingly, Plaintiff's claims against Defendants Prison Counselor Unknown Nesbitt, DRF, Classification Director J. Burns, Business Office Director D. Dine, and Accounting Tech Unknown King regarding Plaintiff's indigent status are transactionally related and involve

21

common questions of law and fact. Moreover, the Court will also address Plaintiff's allegations against Defendant Nesbitt relating to legal call-outs and his words with Defendant White before the out-of-cell misconduct was written. However, Plaintiff's claims against Defendants Unknown Eeardsman, Unknown Blair, Unknown White, R. Loomis, J. Kissell, A. Hitchingham, Unknown Bigelow, Unknown Juarez, Unknown Wright, Randee Rewerts, Unknown Garcia, and Unknown Becher involve issues that are transactionally unrelated to, and do not share common questions of law or fact with, the claims relating to indigency.

It appears that Plaintiff believes that all of the events set forth in the complaint are related simply because they occurred during his incarceration at DRF. However, such belief does not show that the claims arise out of the same transaction or occurrence. Accordingly, the Court concludes that Plaintiff's claims against Defendants Nesbitt, DRF, Burns, Dine, and King are properly joined, but that Plaintiff has improperly joined Defendants Eeardsman, Blair, White, Loomis, Kissell, Hitchingham, Bigelow, Juarez, Wright, Rewerts, Garcia, and Becher to this action.

## B. Remedy

Because the Court has concluded that Plaintiff has improperly joined Defendants Eeardsman, Blair, White, Loomis, Kissell, Hitchingham, Bigelow, Juarez, Wright, Rewerts, Garcia, and Becher to this action, the Court must determine an appropriate remedy. Under Rule 21 of the Federal Rules of Civil Procedure, "[m]isjoinder of parties is not a ground for dismissing an action." Fed. R. Civ. P. 21. Instead, Rule 21 provides two remedial options: (1) misjoined parties may be dropped on such terms as are just; or (2) any claims against misjoined parties may be severed and proceeded with separately. *See Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 572–73 (2004) ("By now, 'it is well settled that Rule 21 invests district courts with authority to allow a dispensable nondiverse party to be dropped at any time . . . .'" (citation omitted)); *DirecTV, Inc. v. Leto*, 467 F.3d 842, 845 (3d Cir. 2006); *see also Michaels Bldg. Co. v. Ameritrust*

*Co., N.A.*, 848 F.2d 674, 682 (6th Cir. 1988) ("[D]ismissal of claims against misjoined parties is appropriate."). "Because a district court's decision to remedy misjoinder by dropping and dismissing a party, rather than severing the relevant claim, may have important and potentially adverse statute-of-limitations consequences, the discretion delegated to the trial judge to dismiss under Rule 21 is restricted to what is 'just.'" *DirecTV*, 467 F.3d at 845.

At least three judicial circuits have interpreted "on such terms as are just" to mean without "gratuitous harm to the parties." *Strandlund v. Hawley*, 532 F.3d 741, 745 (8th Cir. 2008) (quoting *Elmore v. Henderson*, 227 F.3d 1009, 1012 (7th Cir. 2000)); *see also DirecTV*, 467 F.3d at 845. Such gratuitous harm exists if the dismissed parties lose the ability to prosecute an otherwise timely claim, such as where the applicable statute of limitations has lapsed, or the dismissal is with prejudice. *Strandlund*, 532 F.3d at 746; *DirecTV*, 467 F.3d at 846–47.

Plaintiff brings this action under 42 U.S.C. § 1983. For civil rights suits filed in Michigan under § 1983, the statute of limitations is three years. *See* Mich. Comp. Laws § 600.5805(2); *Carroll v. Wilkerson*, 782 F.2d 44 (6th Cir. 1986) (per curiam); *Stafford v. Vaughn*, No. 97-2239, 1999 WL 96990, at *1 (6th Cir. Feb. 2, 1999). The statute of limitations begins to run when the aggrieved party knows or has reason to know of the injury that is the basis of his action. *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996). Plaintiff's allegations against these Defendants relate to events on or after July of 2023, through December of 2023. (*See* Compl., ECF No. 1, PageID.16.) Plaintiff's complaint provides no indication that the statute of limitations has or will run on Plaintiff's claims against the misjoined Defendants. Therefore, Plaintiff has provided no basis for this Court to conclude that he would suffer gratuitous harm if his claims against the misjoined Defendants are dismissed without prejudice.

Accordingly, the Court will exercise its discretion under Rule 21 and drop Defendants Eeardsman, Blair, White, Loomis, Kissell, Hitchingham, Bigelow, Juarez, Wright, Rewerts, Garcia, and Becher because they are misjoined. The Court will dismiss Plaintiff's claims against Eeardsman, Blair, White, Loomis, Kissell, Hitchingham, Bigelow, Juarez, Wright, Rewerts, Garcia, and Becher without prejudice to the institution of a new, separate lawsuit or lawsuits.[14]

## IV.    Failure to State a Claim

A complaint may be dismissed for failure to state a claim if it fails "to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Id.*; *Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the

---

[14] If Plaintiff wishes to proceed with his claims against one or more of the misjoined Defendants, he may do so by filing new civil action(s) on the form provided by this Court, *see* W.D. Mich. LCivR 5.6(a), and paying the required filing fees or applying in the manner required by law to proceed *in forma pauperis*. As fully discussed in this opinion, Plaintiff is cautioned that he must limit all future actions to Defendants and claims that are transactionally related to one another. The Court may, in its discretion and without further warning, dismiss any future complaint, or part thereof, filed by Plaintiff that contains claims that are misjoined. Plaintiff is advised that simply because separate and discrete events occurred during Plaintiff's incarceration at a particular correctional facility does mean that all claims arising out of these events are properly joined.

court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(ii)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994). The Court construes Plaintiff's allegations as raising First Amendment retaliation claims against all properly joined Defendants, a First Amendment access to the courts claim, Eighth Amendment conditions of confinement claims against all properly joined Defendants, Fourteenth Amendment due process claims against Defendants Burns, Dine, and King, and state law claims for violation of MDOC policy directives against Defendants Burns, Dine, and King.

### A.    Defendant DRF

Plaintiff names DRF as a Defendant. DRF is not a separate entity capable of being sued. As this Court noted in *Ryan v. Corizon Health Care*, No. 1:13-cv-525, 2013 WL 5786934 (W.D. Mich. Oct. 28, 2013), "individual prisons named as Defendants . . . (ICF, IBC, LRF and RGC) are buildings used by the MDOC to house prisoners. They are not the proper public entity for suit" *Id.* at *7; *see also Watson v. Gill*, 40 F. App'x 88, 89 (6th Cir. 2002) ("The McCracken County Jail is not a legal entity susceptible to suit . . . [; i]t is a department of the county . . . ."); *Caruthers v. Corr. Medical Serv., Inc.*, No. 1:10-cv-274, 2010 WL 1744881, at *1 (W.D. Mich. Apr. 27, 2010)

("The Duane Waters Hospital is not an entity capable of being sued. Rather, it is a building owned by the Michigan Department of Corrections."); *Poole v. Michigan Reformatory*, No. 09-CV-13093, 2009 WL 2960412, at *1 (E.D. Mich. Sept. 11. 2009) ("Plaintiff names the Michigan Reformatory, the Earnest C. Brooks Correctional Facility, and the Macomb Correctional Facility as defendants in this action. Those entities, however, are institutions operated by the MDOC and are not . . . legal entities subject to suit . . . .").

Moreover, § 1983 expressly requires that a named defendant be a "person." *See Monell v. Dep't of Soc. Servs*., 436 U.S. 658 (1978). But neither the State of Michigan nor the MDOC is a "person" within the meaning of § 1983. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58 (1989) (holding a state is not a "person"); *Parker v. Mich. Dep't of Corr.*, 65 F. App'x 922, 923 (6th Cir. 2003) (citing *Will* and holding that the MDOC is not a "person."). And, obviously, because DRF is not an entity separate from the MDOC, it is not a "person" under § 1983 either. *See, e.g.*, *Tinney v. Detroit Reentry Center*, No. 2:19-CV-10894-TGB, 2020 WL 4334964, at *2 (E.D. Mich. July 28, 2020) (stating "[a] state prison facility is not a person . . . capable of being sued under § 1983"); *Ward v. Healthcare Clinic*, No. 16-10646, 2016 WL 3569562, at *1 (E.D. Mich. July 1, 2016) (same); *Poole*, 2009 WL 2960412, at *1 (same).

Finally, even if Petitioner had identified the MDOC or the State of Michigan as the Defendant, rather than DRF, and even if those entities were "persons" under § 1983, Plaintiff's claim would be properly dismissed because the MDOC and the State of Michigan are immune from suit under the Eleventh Amendment. Regardless of the form of relief requested, the states and their departments are immune under the Eleventh Amendment from suit in the federal courts, unless the state has waived immunity or Congress has expressly abrogated Eleventh Amendment immunity by statute. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98–101 (1984);

26

*Alabama v. Pugh*, 438 U.S. 781, 782 (1978); *O'Hara v. Wigginton*, 24 F.3d 823, 826 (6th Cir. 1994). Congress has not expressly abrogated Eleventh Amendment immunity by statute, *Quern v. Jordan*, 440 U.S. 332, 341 (1979), and the State of Michigan has not consented to civil rights suits in federal court. *Abick v. Michigan*, 803 F.2d 874, 877 (6th Cir. 1986). In numerous opinions, the Sixth Circuit has specifically held that the MDOC is absolutely immune from a § 1983 suit under the Eleventh Amendment. *See, e.g., Harrison v. Michigan*, 722 F.3d 768, 771 (6th Cir. 2013); *Diaz v. Mich. Dep't of Corr.*, 703 F.3d 956, 962 (6th Cir. 2013); *McCoy v. Michigan*, 369 F. App'x 646, 653–54 (6th Cir. 2010).

### B.      Retaliation

Plaintiff contends that Defendants retaliated against him in violation of the First Amendment. Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (*en banc*). In order to set forth a First Amendment retaliation claim, a plaintiff must establish three elements: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Id*. Moreover, a plaintiff must be able to show that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). The Court will address the elements with respect to each Defendant.

### 1.      Defendant Nesbitt

Plaintiff contends that Defendant Nesbitt, on July 8, 2023, lied about requesting indigent status on Plaintiff's behalf. In a grievance Plaintiff wrote on July 20, 2023, Plaintiff noted that Defendant Nesbitt had not called Plaintiff out for "legal mail" for one week. (Grievance, ECF

No. 1-2, PageID.68) Just two weeks later, on August 2, 2023, in Plaintiff's Step II appeal of the rejection of that grievance, Plaintiff wrote that he spoke with Defendant Nesbitt about that issue, but that Nesbitt said he was not the person who handles a call-out for legal mail. (*Id*., PageID.70.) The next day, Plaintiff discovered that he was not on the indigent list for August 2023. (Grievance, ECF No. 1-1, PageID.36.) On August 3, 2023, he filed a grievance against Defendant Nesbitt for lying to Plaintiff about the matter. (*Id*.) Later that day, Plaintiff notes that Defendant Nesbitt spoke to Defendant White. Those words preceded Defendant White writing a misconduct against Plaintiff for being out of his cell while Plaintiff was confined to his cell on loss-of-privileges.

### a.    Protected Conduct

With respect to the first element of a First Amendment retaliation claim, an inmate has a right to file "non-frivolous" grievances against prison officials on his own behalf, whether written or oral. *Maben v. Thelen*, 887 F.3d 252, 265 (6th Cir. 2018); *Mack v. Warden Loretto FCI*, 839 F.3d 286, 298–99 (3d Cir. 2016). At this stage of the proceedings, the Court concludes that Plaintiff alleged sufficient facts to suggest that he engaged in protected conduct for purposes of his First Amendment claim when he filed the two grievances mentioned above.

### b.    Adverse Action

With regard to the second element, the adverseness inquiry is an objective one and does not depend on how a particular plaintiff reacted. The relevant question is whether the defendant's conduct is "capable of deterring a person of ordinary firmness"; the plaintiff need not show actual deterrence. *Bell v. Johnson*, 308 F.3d 594, 606 (6th Cir. 2002) (emphasis in original).

Plaintiff alleges a few instances of conduct by Defendant Nesbitt that worked to Plaintiff's detriment: the lie on July 8 that Nesbitt had submitted an indigency request for Plaintiff; the refusal to "call out" Plaintiff for legal mail for one week; and the words exchanged between Nesbitt and White that preceded the misconduct report. The Court will accept Plaintiff's contentions that (1)

the "lie" that cost him indigent status for a month, and (2) the words that purportedly led to a misconduct determination, as sufficient to show that the adverse actions were capable of deterring a person of ordinary firmness from engaging in protected conduct.

The same is not true, however, with Plaintiff's claim that Defendant Nesbitt failed to call Plaintiff out for legal mail. Plaintiff does not allege that there was any reason for a legal mail call out during that time period.[15] With regard to that "detrimental conduct," the Court concludes that Plaintiff has failed to allege facts that support an inference that the conduct rose to the level of adverse action.

### c.    Retaliatory Motive

Finally, to state a First Amendment retaliation claim, Plaintiff must allege facts that support an inference that the adverse action was motivated by the protected conduct. As explained below, Plaintiff's allegations regarding this third element fall short.

Retaliation is easy to allege but it can seldom be shown by direct evidence. *See Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005); *Murphy v. Lane*, 833 F.2d 106, 108 (7th Cir. 1987). "[A]lleging merely the ultimate fact of retaliation is insufficient." *Murphy*, 833 F.2d at 108. "[C]onclusory allegations of retaliatory motive 'unsupported by material facts will not be sufficient to state...a claim under § 1983.'" *Harbin-Bey*, 420 F.3d at 580 (quoting *Gutierrez h*, 826 F.2d at 1538–39); *see also Murray v. Unknown Evert*, 84 F. App'x 553, 556 (6th Cir. 2003)

---

[15] Plaintiff indicates that upon his arrival he filed a request for a law library call out, but he does not suggest that Defendant Nesbitt was the recipient of that request. (Compl., ECF No. 1, PageID.9.) Rather, Plaintiff indicates that he raised the issues with Defendants Kissell, Hitchingham, and/or Loomis. (*Id.*, PageID.9–11, 20; Grievances, ECF No 1-3, PageID.84–87.) Indeed, it does not appear that Defendant Nesbitt was the subject of the grievance because it was ultimately rejected for failing to attempt an informal resolution first with the involved staff member even though the grievance makes clear that Plaintiff spoke to Defendant Nesbitt before he filed. (Grievance, ECF No. 1-2, PageID.68–70.)

(holding that in complaints screened pursuant to 28 U.S.C. § 1915A, "[c]onclusory allegations of retaliatory motive with no concrete and relevant particulars fail to raise a genuine issue of fact for trial" (internal quotation marks omitted)); *Lewis v. Jarvie*, 20 F. App'x 457, 459 (6th Cir. 2001) ("[B]are allegations of malice on the defendants' parts are not enough to establish retaliation claims [that will survive § 1915A screening]." (citing *Crawford-El v. Britton*, 523 U.S. 574, 588 (1998))).

In some circumstances, temporal proximity "may be 'significant enough to constitute indirect evidence of a causal connection so as to create an inference of retaliatory motive.'" *Muhammad v. Close*, 379 F.3d 413, 417–18 (6th Cir. 2004) (quoting *DiCarlo v. Potter*, 358 F.3d 408, 422 (6th Cir. 2004)). However, "[c]onclusory allegations of temporal proximity are not sufficient to show a retaliatory motive." *Skinner v. Bolden*, 89 F. App'x 579, 580 (6th Cir. 2004). And, in prior cases, the Sixth Circuit has been reluctant to find that temporal proximity between the filing of a grievance and an official's adverse conduct, standing alone, is sufficient to establish a retaliation claim. *Compare Muhammad*, 379 F.3d at 417–18 (quoting *DiCarlo*, 358 F.3d at 422), *and Briggs v. Westcomb*, No. 19-1837 (6th Cir. Mar. 10, 2020) (unpublished) (holding that allegations of temporal proximity were sufficient where the filing of retaliatory misconduct by correctional officers occurred six days after Plaintiff filed a grievance against a medical provider, but only one day after the provider learned of the grievance), *with Hill*, 630 F.3d at 476 (discussing that the Sixth Circuit has been reluctant to find that temporal proximity alone shows a retaliatory motive).

With regard to Defendant Nesbitt's alleged lie, Plaintiff has failed to allege any facts that support an inference that the lie was retaliatory for Plaintiff's protected conduct because Plaintiff does not allege any protected conduct that preceded the lie. The same is not true regarding the misconduct report.

It appears that the misconduct report written against Plaintiff on August 3, 2023, by Defendant White *may* have been preceded by the grievance Plaintiff wrote on that same date. (Grievance, ECF No. 1-1, PageID.36–39; Misconduct Rep. & Misconduct Hr'g Rep., ECF No. 1-4, PageID.89–90.) Plaintiff was subject to a "loss of privileges" sanction from August 2 to October 1, 2023. (Misconduct Rep., ECF No. 1-4, PageID.89.) The misconduct occurred at 3:10 p.m. on August 3. (*Id*.) The grievance was written and received on August 3, but there is no indication of the time the grievance was submitted. Plaintiff's allegations can be read to support the inference that the grievance—or at least Defendant Nesbitt's knowledge that Plaintiff was planning on filing a grievance—preceded the misconduct. (Compl., ECF No. 1, PageID.12, ¶ 23.) Plaintiff does not specifically allege the order in which the events occurred.

Other than that potential temporal proximity and a conclusory statement that Nesbitt was upset with Plaintiff for filing the grievance, (*id*.), Plaintiff does not allege facts that support an inference that Nesbitt was motivated by a retaliatory intent. Plaintiff does not allege that the misconduct was false; rather, he posits that because prisoners have a First Amendment right to use the mails, he was entitled to be out of his cell even though he was on "loss of privileges" status. (*Id*. PageID.13, ¶ 25.) Plaintiff states only that he saw Defendant Nesbitt nod and say something to Defendant White that day. Plaintiff alleges no facts that support an inference that the nod or words exchanged had anything to do with the grievance or the misconduct nor does Plaintiff allege facts to support an inference that Defendant Nesbitt was even aware of the grievance when he and Defendant White exchanged words.[16] Plaintiff offers nothing but speculation that there was any relationship between the grievance and the misconduct ticket.

---

[16] Plaintiff does not allege that Defendant White, the author of the misconduct report, acted with any retaliatory motive. To the extent that Plaintiff intended to raise a retaliation claim against Defendant White, there is no common foundation in fact or law between that claim and the core

The Sixth Circuit Court of Appeals "typically avoid[s] sole reliance on temporal proximity." *Mustin v. Wainwright*, No. 23-3671, 2024 WL 3950810, at *9 (6th Cir. Aug. 27, 2024) (citing *Muhammad*, 379 F.3d at 417–18). Where the alleged adverse action is a misconduct report, "close temporal proximity [does] not enable inference of retaliatory intent where plaintiff admit[s] to engaging in the behavior that gave rise to the misconduct report and thus support[s the] officer's account of events." *Id*. (citing *LaFountain v. Mikkelson*, 478 F. App'x 989, 993 (6th Cir. 2012)). On the other hand, in *Richards v. Perttu*, 96 F.4th 911, 919 (6th Cir. 2024), the court concluded that where the adverse action—ripping up Richards's grievances—occurred "*immediately after*" the protected conduct, and Perttu had threatened to interfere with Richards's filing of grievances, Richards had sufficiently raised the issue of a retaliatory motive.

In Plaintiff's case, if in fact the grievance preceded the misconduct, the two events were certainly close in time. Perhaps they were close enough in time to conclude that the misconduct occurred *immediately after* the grievance. In this case, however, the adverse action—a misconduct report—is not always wrong like ripping up grievances was in the *Richards* case. And Nesbitt never threatened Plaintiff with a misconduct like Perttu threatened Richards. Absent those elements, Plaintiff's allegations truly boil down to nothing more than temporal proximity and, based on the facts as Plaintiff has alleged them, that truly stands alone and does not sufficiently support an inference of retaliatory intent.

For all of these reasons, the Court concludes that Plaintiff has failed to state a First Amendment retaliation claim against Defendant Nesbitt.

---

indigency-related claims that permit the joinder of Defendants in addition to Defendant Nesbitt. Accordingly, any retaliation claim against Defendant White would not be properly joined in this action.

### 2.      Defendants Burns, Dine, and King

Defendants Burns, Dine, and King are named for their roles in applying the indigent prisoners policy directive and/or operating procedures for the months of September through December and then communicating the result to Plaintiff. Plaintiff filed a grievance about being denied indigent status for September 2023. (Grievance, ECF No. 1-1, PageID.40–42.) He also filed a written complaint about subsequent denials. (ECF No. 1-1, PageID.46.)

Certainly Plaintiff's grievance and handwritten complaint are protected conduct and denial of indigent status could be adverse action. Plaintiff's claim against these Defendants, however, fails at the third step. He alleges no facts to support the inference that the denial of indigent status was motivated by Plaintiff's protected conduct. Indeed, based on the indigent prisoners policy directive and operating procedure, as well as the account documents, it is apparent that, despite Plaintiff's protests to the contrary, the objective criteria for denying indigent status were present each month. Accordingly, the Court concludes that Plaintiff has failed to state a First Amendment retaliation claim against Defendants Burns, Dine, and King.

### C.      Eighth Amendment

Although Plaintiff does not specifically mention the Eighth Amendment implications of being denied indigent status, he repeatedly alleges that he was denied hygiene supplies. The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. Punishment may not be "barbarous," nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345–46 (1981). The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346). The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148

33

F.3d 596, 600–01 (6th Cir. 1998). The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted). Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954. "Routine discomfort is 'part of the penalty that criminal offenders pay for their offenses against society.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (quoting *Rhodes*, 452 U.S. at 347). As a consequence, "extreme deprivations are required to make out a conditions-of-confinement claim." *Id.*

In order for a prisoner to prevail on an Eighth Amendment claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with "'deliberate indifference' to [his] health or safety." *Mingus v. Butler*, 591 F.3d 474, 479–80 (6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)) (applying deliberate indifference standard to medical claims); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims). The deliberate-indifference standard includes both objective and subjective components. *Farmer*, 511 U.S. at 834; *Helling*, 509 U.S. at 35–37. To satisfy the objective prong, an inmate must show "that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. Under the subjective prong, an official must "know[] of and disregard[] an excessive risk to inmate health or safety." *Id.* at 837. "[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842. "It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." *Id.* at 836.

Plaintiff contends that he was denied basic hygiene essentials for several months. Denial of such items for short periods of time constitute temporary inconveniences that do not rise to the level of an Eighth Amendment violation. *See, e.g.*, *Matthews v. Murphy*, No. 90-35458, 1992 WL 33902, at *4 (9th Cir. Feb. 25, 1992) (holding that an inmate's allegations that he was deprived of a towel, toothbrush, toothpowder, comb, soap, and other personal hygiene items for approximately 34 days did not rise to the level of a constitutional violation); *Crump v. Janz*, No. 1:10-cv-583, 2010 WL 2854266, at *4 (W.D. Mich. July 19, 2010) (concluding that the denial of a toothbrush and toothpaste for 35 days constituted a mere temporary inconvenience); *Robertson v. McRay*, No. 03-22823-CIV, 2006 WL 2882502, at *7 (S.D. Fla. July 28, 2006) (finding that the failure to provide indigent kits containing hygiene items and envelopes, stamps and paper more than half the time over a two-year period did not violate the Eighth Amendment). Moreover, Plaintiff alleges no harm or risk of harm arising from his alleged inability to acquire these items. *See Flanory v. Bonn*, 604 F.3d 249, 254 (6th Cir. 2010) (recognizing that the objective component of the Eighth Amendment test is typically not met by temporary deprivations that result in no physical injury); *James v. O'Sullivan*, 62 F. App'x 636, 639 (7th Cir. 2003) (holding that a 49-day denial of a comb, deodorant, and cleaning supplies, none of which jeopardized the prisoner-plaintiff's health, failed to satisfy the objective component of an Eighth Amendment claim); *Penrod v. Zavaras*, 94 F.3d 1399, 1406 (10th Cir. 1996) (holding that a 69-day denial of toothpaste may constitute a constitutional deprivation if plaintiff had to be treated by a dentist for bleeding and receding gums and tooth decay); *Holder v. Merline*, No. Civ.A. 05-1024 RBK, 2005 WL 1522130, at *6 (D.N.J. June 27, 2005) (concluding that a three-week deprivation of a toothbrush and sneakers does not implicate the Eighth Amendment where no physical effects resulted).

### 1.      Defendant Nesbitt

Based on Plaintiff's allegations, Defendant Nesbitt is responsible for Plaintiff's lack of hygiene supplies for the month of August 2023. Deprivation of such supplies for 31 days, however, is the sort of temporary inconvenience that does not rise to the level of an Eighth Amendment violation, particularly where Plaintiff does not allege any resulting harm. Accordingly, Plaintiff has failed to state an Eighth Amendment claim against Defendant Nesbitt.

### 2.      Defendants Burns, Dine, and King

If Defendants Burns, Dine, and King continued Plaintiff's deprivation through September, October, November, and December, the duration of the deprivation might stray beyond just a temporary inconvenience. But the documents Plaintiff attaches to his complaint indicate that Defendants did not deprive Plaintiff of hygiene supplies at all.

Indigent status is not a free path to endless hygiene supplies. The MDOC Indigent Prisoners Policy Directive 04.02.120 allows indigent prisoners a loan of the difference between $11.00 and the prisoner's available account balance plus receipts for the preceding month. ((ECF No. 1-1, PageID.56.) For Plaintiff to qualify, therefore, he would have to show that his account balance on the first day of the calendar month preceding his application plus his total receipts for that month did not equal or exceed $11.00. (*Id*.)

The daily transaction summary Plaintiff attaches to his complaint shows that $11.40 was deposited to his account on August 14, 2023. (ECF No. 1-1, PageID.63.) That balance remained in his account for 17 days. (*Id*.) Plaintiff offers no explanation as to why he did not purchase hygiene supplies during that period.

Plaintiff started the month of September with a balance of $1.40; he added payroll in the amount of $25.08 on September 27, 2023. (*Id*.) Those amounts disqualified Plaintiff from indigent

status for the month of October. Moreover, they provided Plaintiff sufficient funds to purchase hygiene supplies. (*Id.*, PageID.63–64.) He apparently chose not to purchase those supplies.

Plaintiff started the month of October with an account balance of $11.42. (*Id.*, PageID.64.) Plaintiff added to that amount payroll in the amount of $25.08. (*Id.*) Those amounts disqualified Plaintiff from indigent status for the month of November. Plaintiff had sufficient funds to purchase hygiene supplies. (*Id.*) He apparently chose not to purchase those supplies.

Plaintiff started the month of November with a balance of $11.00. (*Id.*) By then he had removed himself from his work assignment, so he apparently had no payroll. Nonetheless, his beginning balance disqualified him from indigent status for the month of December. Plaintiff had sufficient funds to purchase hygiene supplies. (*Id.*) He apparently chose not to purchase those supplies. That choice undercuts any possible Eighth Amendment claim. *See, e.g.*, *Fields v. Gerth*, No. 2:13-cv-310, 2015 WL 2062068, at *4 (W.D. Mich. May 4, 2015) (concluding that "since Plaintiff was not denied personal hygiene items and simply chose not to purchase the items with his own money, Plaintiff cannot support his Eighth Amendment claim").

Because Plaintiff has failed to allege facts that show Defendants Burns, Dine, and King, acted with deliberate indifference to a substantial risk of harm to Plaintiff, Plaintiff has failed to state an Eighth Amendment claim against Defendants Burns, Dine, and King.

### D.    Fourteenth Amendment Due Process

Plaintiff indicates that Defendants' conduct violated prison policy. To the extent Plaintiff invokes prison policy, he fails to allege a constitutional claim. Claims under § 1983 can only be brought for "deprivations of rights secured by the Constitution and laws of the United States." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924 (1982). Section 1983 does not provide redress for a violation of a state law. *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995); *Sweeton v. Brown*, 27 F.3d 1162, 1166 (6th Cir. 1994); *see also Laney v. Farley*, 501 F.3d 577, 580–81 & n.2 (6th

Cir. 2007). To demonstrate a violation of procedural due process, a plaintiff must prove the following elements: (1) a life, liberty, or property interest requiring protection under the Due Process Clause, and (2) a deprivation of that interest (3) without adequate process. *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006). "Without a protected liberty or property interest, there can be no federal procedural due process claim." *Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 519 (6th Cir. 2007) (citing *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 579 (1972)).

Courts routinely have recognized that a prisoner does not enjoy any federally protected liberty or property interest in state procedure. *See Olim v. Wakinekona*, 461 U.S. 238, 250 (1983); *Laney v. Farley*, 501 F.3d 577, 581 n.2 (6th Cir. 2007); *Brody v. City of Mason*, 250 F.3d 432, 437 (6th Cir. 2001); *Sweeton*, 27 F.3d at 1164; *Smith v. Freland*, 954 F.2d 343, 347–48 (6th Cir. 1992); *Barber v. City of Salem*, 953 F.2d 232, 240 (6th Cir. 1992). Plaintiff's allegations that multiple Defendants violated prison policy therefore fail to raise a cognizable federal due process claim.

### E.   State Law Claims

To the extent that Plaintiff raises the claims that Defendants violated policy directives as a matter of state law, he seeks to invoke this Court's supplemental jurisdiction. Ordinarily, where a district court has exercised jurisdiction over a state-law claim solely by virtue of supplemental jurisdiction and the federal claims are dismissed prior to trial, the court will dismiss the remaining state-law claims. *See Experimental Holdings, Inc.,* 503 F.3d at 521 ("Generally, once a federal court has dismissed a plaintiff's federal law claim, it should not reach state law claims." (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966))); *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993). In determining whether to retain supplemental jurisdiction, "[a] district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law

issues." *Landefeld*, 994 F.2d at 1182; *see also Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) ("Residual jurisdiction should be exercised only in cases where the interests of judicial economy and the avoidance of multiplicity of litigation outweigh our concern over needlessly deciding state law issues." (internal quotations omitted)). Dismissal, however, remains "purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citing 28 U.S.C. § 1367(c)); *Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843, 850 (6th Cir. 2012).

Here, judicial economy favors retaining supplemental jurisdiction. For all the reasons set forth above, Plaintiff has failed to state a claim based on Defendants' alleged failure to follow MDOC policy directives because Defendants actually followed the policy directives provided by Plaintiff.

### F.      First Amendment Access to the Courts

It is well established that prisoners have a constitutional right of access to the courts. *Bounds v. Smith*, 430 U.S. 817, 821 (1977). The principal issue in *Bounds* was whether the states must protect the right of access to the courts by providing law libraries or alternative sources of legal information for prisoners. *Id.* at 817. The Court further noted that in addition to law libraries or alternative sources of legal knowledge, the states must provide indigent inmates with "paper and pen to draft legal documents, notarial services to authenticate them, and with stamps to mail them." *Id.* at 824–25. The right of access to the courts also prohibits prison officials from erecting barriers that may impede the inmate's access to the courts. *See Knop v. Johnson*, 977 F.2d 996, 1009 (6th Cir. 1992).

An indigent prisoner's constitutional right to legal resources and materials is not, however, without limit. In order to state a viable claim for interference with his access to the courts, a plaintiff must show "actual injury." *Lewis v. Casey*, 518 U.S. 343, 349 (1996); *see also Talley-Bey v. Knebl*, 168 F.3d 884, 886 (6th Cir. 1999); *Knop*, 977 F.2d at 1000. In other words, a plaintiff

must plead and demonstrate that the shortcomings in the prison legal assistance program or lack of legal materials have hindered, or are presently hindering, his efforts to pursue a nonfrivolous legal claim. *Lewis*, 518 U.S. at 351–53; *see also Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir. 1996). The Supreme Court has strictly limited the types of cases for which there may be an actual injury:

> *Bounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims. The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

*Lewis*, 518 U.S. at 355. "Thus, a prisoner's right to access the courts extends to direct appeals, habeas corpus applications, and civil rights claims only." *Thaddeus-X v. Blatter*, 175 F.3d 378, 391 (6th Cir. 1999) (en banc). Moreover, the underlying action must have asserted a non-frivolous claim. *Lewis*, 518 U.S. at 353; *accord Hadix v. Johnson*, 182 F.3d 400, 405 (6th Cir. 1999) (*Lewis* changed actual injury to include requirement that action be non-frivolous).

In addition, the Supreme Court squarely has held that "the underlying cause of action . . . is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002) (citing *Lewis*, 518 U.S. at 353 & n.3). "Like any other element of an access claim, the underlying cause of action and its lost remedy must be addressed by allegations in the complaint sufficient to give fair notice to a defendant." *Id.* at 415.

The Court is familiar with "the underlying cause of action" in Plaintiff's case because he raised the same issues that he raised in that cause of action in a recent habeas case: *Price v. Corrigan*, 2:24-cv-38 (W.D. Mich.). The Court recently dismissed Plaintiff's habeas petition, providing the following summary of Plaintiff's conviction and sentence:

On July 25, 2019, Petitioner pleaded guilty in the Montcalm County Circuit Court to operating a motor vehicle under the influence of intoxicating liquors—third offense, in violation of Mich. Comp. Laws § 257.625. (ECF No. 14-2.) On October 17, 2019, the trial court sentenced Petitioner to five months' incarceration, with credit for 106 days served, and three years of probation. (ECF No. 14-4.)

On December 4, 2019, the trial court issued a summons for Petitioner to appear to answer to charges that he had violated his probation. (ECF No. 1-1, PageID.583.) The trial court held a hearing with respect to the probation violations on February 20, 2020. (ECF No. 14-8.) At that time, Petitioner's probation officer, Brett Joslin, testified. (*Id.*, PageID.660–661.) Ms. Joslin testified that she had directed Petitioner to report to her on the day he was released from the Muskegon County Jail. (*Id.*, PageID.662.) Ms. Joslin testified that even though Petitioner was released on December 2, 2019, he did not report until December 3, 2019. (*Id.*) Petitioner did not contact Ms. Joslin on December 2, 2019, to explain his whereabouts. (*Id.*, PageID.664.)

When Petitioner reported on December 3, 2019, Ms. Joslin directed Petitioner to take a drug test. (*Id.*, PageID.666.) Petitioner refused, stating that "he was not going to urinate in the bathroom with another man standing there." (*Id.*) Ms. Joslin testified that Petitioner had a "very poor" attitude and was "very argumentative." (*Id.*, PageID.667.) Ms. Joslin noted that Petitioner "blamed us, essentially, for the situation that he was in." (*Id.*) Petitioner also admitted that he had not read his conditions of probation because "it was all setting him up to fail, that he couldn't abide by the conditions, and he was just being set up to fail." (*Id.*) Ms. Joslin also noted that Petitioner failed to provide information regarding an adequate residence and that he "was trying to give [her] an address of a place that he admitted he was not going to live at." (*Id.*, PageID.674.)

Petitioner called Lewis Corwin, the individual responsible for drug testing at the probation office, to testify on his behalf. (*Id.*, PageID.677.) Mr. Corwin testified that he came into contact with Petitioner on December 3, 2019, to collect a sample for drug testing. (*Id.*) He was not able to complete testing because Petitioner told Mr. Corwin that he "couldn't pee in front of [him]." (*Id.*, PageID.678.) Mr. Corwin testified that Petitioner "was in [the testing area] two or three times." (*Id.*) On the last time, Petitioner "said that he couldn't produce a sample because [Mr. Corwin] was staring at him." (*Id.*) Mr. Corwin could not remember if he suggested that Petitioner drink some water. (*Id.*) Mr. Corwin noted that Petitioner was "rude" and "had an attitude about him." (*Id.*) He said that it was possible that he turned on the water faucet to help, but that it did not work in Petitioner's case. (*Id.*)

Petitioner also testified on his behalf. (*Id.*, PageID.683.) He testified that he did not read his probation conditions because he did not have access to them until he was released. (*Id.*, PageID.684.) Petitioner explained that he did not produce a urine sample because he "couldn't urinate with somebody behind [him]." (*Id.*, PageID.688.) Petitioner testified that he did drink water to help, but to no avail. (*Id.*, PageID.689.) Petitioner also testified that he was unable to give Ms. Joslin an

address because he did not know where he was going to stay. (*Id.*, PageID.691.) He denied being hostile during his time at the probation office on December 3, 2019. (*Id.*)

Ultimately, the trial court found Petitioner guilty of violating his probation. The trial court first noted that Petitioner failed to comply with drug testing requirements on December 3, 2019, and that Petitioner's "story about he cannot provide a sample" did not matter. (*Id.*, PageID.711.) The trial court found Petitioner not guilty of failing to report given that "his orders, and our written requirements, are that he is to report by the next business day," and Petitioner "in fact, did that." (*Id.*, PageID.712.) The court noted that Petitioner had been given an oral order to report on the same day that he was released from jail, but indicated that "the Court does speak through its written orders." (*Id.*) Finally, the trial court found Petitioner guilty of failing to provide an adequate residence. (*Id.*) As noted above, the Court sentenced Petitioner to 14 months to 5 years of incarceration, with credit for 256 days of time served. (*Id.*, PageID.725.)

Op., *Price v. Corrigan*, 2:24-cv-38 (W.D. Mich. Nov. 15, 2024) (ECF No. 19, PageID.1872–1874). Plaintiff appealed his conviction and sentence to no avail. *Id.*, (PageID.1874). Plaintiff filed a habeas petition in the United States District Court for the Eastern District of Michigan which that court dismissed on June 28, 2021, for failure to exhaust state court remedies. *Id.*, (PageID.1875). Plaintiff then filed a motion for relief from judgment in the state trial court. *Id.*

The trial court denied Plaintiff's motion for relief from judgment by order entered August 8, 2022. Order, *People v. Price*, No. 19-S-25595-FH (Montcalm Cnty. Cir. Ct., Aug. 8, 2022).[17] The trial court denied relief on procedural grounds concluding that Plaintiff had failed to satisfy the requirements of Michigan Court Rule 6.508(D). *Id.* at p. 5. That rule requires that the movant demonstrate good cause for failing to raise the issue on direct appeal and actual prejudice. Mich. Ct. R. 6.508(D). Plaintiff sought leave to appeal that determination in the Michigan Court of Appeals. As outlined above, that court denied leave on July 5, 2023, because Plaintiff's application lacked merit. Although Plaintiff's motion for reconsideration was rejected, Plaintiff timely filed

---

[17] The order was filed as part of the Rule 5 materials in Plaintiff's habeas petition. *Price v. Corrigan*, 2:24-cv-38 (W.D. Mich.) (ECF No. 14-10).

an application for leave to appeal in the Michigan Supreme Court. That Court denied leave to appeal in an order entered January 30, 2024, because Plaintiff had "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Price*, 1 N.W.3d 254 (Mich. 2024).

Plaintiff does not specifically identify the arguments he was prevented from raising in his proposed motion for reconsideration. His two-page motion for an extension of time generally refers to some issues. (ECF No. 1-2, PageID.74–75.) Those issues, however, are simply a repeat of the issues he raised in his application for leave to appeal. *Id*.; Mich. Ct. App. Rule 5 Materials, *Price v. Corrigan*, 2:24-cv-38 (W.D. Mich.) (ECF Nos. 14-13, 14-14, PageID.957-1570). Moreover, whatever issues Plaintiff might have raised in his anticipated motion for reconsideration, he was able to raise them two weeks later in his application for leave to appeal to the Michigan Supreme Court. Mich. Rule 5 Materials, *Price v. Corrigan*, 2:24-cv-38 (W.D. Mich.) (ECF No. 14-16, PageID.1706–1839). Nonetheless, the Michigan Supreme Court also concluded that Plaintiff did not establish entitlement to relief under Michigan Court Rule 6.508(D). *Price*, 1 N.W.3d at 254. Under the circumstances alleged by Plaintiff, therefore, the Court concludes that, to the extent that Defendants Nesbitt or Dine interfered with Plaintiff's pursuit of his motion for reconsideration, Plaintiff has failed to allege any actual injury as a result. Accordingly, Plaintiff has failed to state a claim for violation of his First Amendment right to access the courts.

Even if Plaintiff could identify an actual injury—some prejudice flowing from his failure to timely file the motion for reconsideration—the result would be the same because his claim would be barred by *Heck v. Humphrey*, 512 U.S. 477 (1994). As the Sixth Circuit Court of Appeals explained:

> *Heck* blocks a state prisoner's § 1983 claim if its success "would necessarily imply the invalidity of his conviction or sentence." 512 U.S. at 487, 114 S.Ct. 2364. The

idea is to channel what amount to unlawful-confinement claims to the place they belong: habeas corpus. *Wilkinson v. Dotson*, 544 U.S. 74, 81, 125 S.Ct. 1242, 161 L.Ed.2d 253 (2005).

Whether *Heck* applies to an access-to-the-court claim alleging state interference with a direct criminal appeal is a new question for us. That it is a new question, however, does not necessarily make it a hard question. Because the right of access is "ancillary to [a lost] underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court," a successful access claim requires a prisoner to show that the defendants have scuttled his pursuit of a "nonfrivolous, arguable" claim. *Christopher v. Harbury*, 536 U.S. 403, 415, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002) (quotation omitted).

Sampson maintains that he is entitled to damages because the defendants prevented him from using the trial transcripts and other materials in his direct—and unsuccessful—appeal. He could prevail on that claim only if he showed that the information could make a difference in a nonfrivolous challenge to his convictions. He could win in other words only if he implied the invalidity of his underlying judgment. *Heck* bars this kind of claim.

*Sampson v. Garrett*, 917 F.3d 880, 881–82 (6th Cir. 2019).

The *Sampson* court's analysis compels the same result for the appeal of an order denying collateral relief. Indeed, it is only because a collateral attack challenges the validity of a conviction or sentence that it falls within the categories of cases that are protected by the guarantee of access to the courts: direct appeals, habeas corpus applications, and civil rights claims. *Thaddeus-X*, 175 F.3d at 391. In *Brown v. Matuszak*, No. 08-1761, 2009 WL 9070627 (6th Cir. Jan. 21, 2009), the Sixth Circuit Court of Appeals determined that "[u]nder *Lewis*, a prisoner's right of access to the courts includes collateral attacks, regardless of whether that attack is brought in state or federal court." *Id*. at *2. Thus, if Plaintiff sufficiently alleged "actual injury" resulting from the alleged interference with his access to the courts, the claim would be barred by *Heck* and properly dismissed for failure to state a claim. *See Kitchen v. Whitmer*, 106 F.4th 525, 534 n.4 (6th Cir. 2024) (stating "[o]ur court, following the Supreme Court's lead, has phrased *Heck* challenges in terms of whether a § 1983 claim is "cognizable," which likely implies that a *Heck* challenge more properly sounds in failure to state a claim as opposed to lack of subject-matter jurisdiction.").

For all of these reasons, Plaintiff has failed to state a claim with regard to denial of his First Amendment right to access the courts.

## **Conclusion**

The Court grants Plaintiff leave to proceed *in forma pauperis* as a released prisoner. Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Defendants Eeardsman, Blair, White, Loomis, Kissell, Hitchingham, Bigelow, Juarez, Wright, Rewerts, Garcia, and Becher have been misjoined. They will be dropped from this action and Plaintiff's claims against them will be dismissed without prejudice. Plaintiff has failed to state a claim against remaining Defendants DRF, Nesbitt, Burns, Dine, and King. Plaintiff's claims against them will be dismissed with prejudice, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c).

An order and judgment consistent with this opinion will be entered.


Dated:    January 24, 2025                    /s/ Ray Kent
                                              Ray Kent
                                              United States Magistrate Judge